**No. 25-20365**
**(consolidated with No. 25-20508)**

In The

# United States Court of Appeals
# for the Fifth Circuit

VIRGINIA ELIZONDO,

*Plaintiff–Appellee*,

*v.*

SPRING BRANCH INDEPENDENT SCHOOL DISTRICT; SHANNON MAHAN, *in her official capacity as member of the* BOARD OF TRUSTEES OF SPRING BRANCH ISD; CAROLINE H. BENNETT, *in her official capacity as member of the* BOARD OF TRUSTEES OF SPRING BRANCH ISD; WALKER AGNEW, JR., *in his official capacity as member of the* BOARD OF TRUSTEES OF SPRING BRANCH ISD; COURTNEY ANDERSON, *in her official capacity as member of the* BOARD OF TRUSTEES OF SPRING BRANCH ISD; DAVID SLATTERY, *in his official capacity as member of the* BOARD OF TRUSTEES OF SPRING BRANCH ISD; CHRIS EARNEST, *in his official capacity as member of the* BOARD OF TRUSTEES OF SPRING BRANCH ISD; and JENNIFER HYLAND, *in her official capacity as member of the* BOARD OF TRUSTEES OF SPRING BRANCH ISD,

*Defendants–Appellants*.

———————————

On Appeal from the U.S. District Court for the Southern District of Texas, Houston Division, Case No. 4:21-CV-01997

———————————

**OPENING BRIEF OF APPELLANTS**
**SPRING BRANCH INDEPENDENT SCHOOL DISTRICT**
**AND THE MEMBERS OF ITS BOARD OF TRUSTEES**

———————————

Thomas R. Phillips
BAKER BOTTS L.L.P.
401 South 1st St., Ste. 1300
Austin, Texas 78704
(512) 322-2500
tom.phillips@bakerbotts.com

Charles J. Crawford
Lucas C. Henry
ABERNATHY, ROEDER, BOYD
& HULLETT, P.C.
1700 Redbud Blvd., Ste. 300
McKinney, Texas 75069
(214) 544-4000
ccrawford@abernathy-law.com
lhenry@abernathy-law.com

Aaron M. Streett
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
beau.carter@bakerbotts.com

*Counsel for Spring Branch Independent School District and
the Members of its Board of Trustees*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- Aaron M. Streett (counsel for Defendants–Appellants)

- Abernathy, Roeder, Boyd & Hullett, P.C. (counsel for Defendants–Appellants)

- Baker Botts L.L.P. (counsel for Defendants–Appellants)

- Barry Abrams (counsel for Plaintiff–Appellee)

- Beau Carter (counsel for Defendants–Appellants)

- Blank Rome, L.L.P. (counsel for Plaintiff–Appellee)

- Caroline Bennett, in her official capacity as member of the Board of Trustees of Spring Branch ISD (Defendant–Appellant)

- Charles J. Crawford (counsel for Defendants–Appellants)

- Chris Earnest, in his official capacity as member of the Board of Trustees of Spring Branch ISD (Defendant–Appellant)

- Courtney Anderson, in her official capacity as member of the Board of Trustees of Spring Branch ISD (Defendant–Appellant)

- David Slattery, in his official capacity as member of the Board of Trustees of Spring Branch ISD (Defendant–Appellant)

- Domingo Llagostera (counsel for Plaintiff–Appellee)

i

- Jennifer Hyland, in her official capacity as member of the Board of Trustees of Spring Branch ISD (Defendant–Appellant)

- Joshua A. Huber (counsel for Plaintiff–Appellee)

- Lucas C. Henry (counsel for Defendants–Appellants)

- Martin Golando (counsel for Plaintiff–Appellee)

- Robert Scott (counsel for Plaintiff–Appellee)

- Shannon Mahan, in her official capacity as member of the Board of Trustees of Spring Branch ISD (former Defendant–Appellant)

- Spring Branch Independent School District (Defendant–Appellant)

- Ted Tredennick, in his official capacity as member of the Board of Trustees of Spring Branch ISD (putative Defendant–Appellant)

- Thomas R. Phillips (counsel for Defendants–Appellants)

- Virginia Elizondo (Plaintiff–Appellee)

- Walker Agnew, Jr., in his official capacity as member of the Board of Trustees of Spring Branch ISD (Defendant–Appellant)

Respectfully submitted,

*/s/ Aaron M. Streett*
Aaron M. Streett

*Counsel for Spring Branch Independent School District and the Members of its Board of Trustees*

ii

## STATEMENT REGARDING ORAL ARGUMENT

Under Fifth Circuit Rule 28.2.3, SBISD submits that the district court's own findings plainly entitle SBISD to judgment as a matter of law under the principles set forth in *Louisiana v. Callais*, 146 S. Ct. 1131 (2026). Oral argument may nonetheless assist the Court because SBISD seeks reversal of a judgment rendered after a bench trial, in light of the Supreme Court's intervening decision.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS .................................................................................... iv

TABLE OF AUTHORITIES .............................................................................. vi

JURISDICTIONAL STATEMENT ................................................................... ix

ISSUES PRESENTED....................................................................................... ix

INTRODUCTION ...............................................................................................1

STATEMENT OF THE CASE .............................................................................3

    I.     Spring Branch Independent School District................................3

    II.    The Politicization of School Boards .........................................4

    III.   Elizondo's Candidacies and the Lawsuit ...................................5

    IV.   The Trial and the Remedial Map................................................6

    V.    The Stay and *Callais* .................................................................9

STANDARD OF REVIEW ................................................................................11

SUMMARY OF ARGUMENT .........................................................................12

ARGUMENT .....................................................................................................13

    I.     *Callais* worked a sea change in Voting Rights Act jurisprudence. .......................................................................................................13

        A.   *Gingles* permitted a purely effects-based Section 2 claim........14

        B.   *Callais* overhauled *Gingles* to require a "strong inference" of intentional discrimination at every stage of the Section 2 analysis. ...............................................................................17

        C.   *Allen* cemented the *Callais* approach.....................................20

    II.    This Court should apply *Callais* and reverse and render judgment in SBISD's favor. ........................................................................21

        A.   Elizondo's claim fails at every step of the *Callais* framework. ...........................................................................21

            1.   Precondition #1: Elizondo's map impermissibly eliminated the at-large system and drew districts based on race..................................................................21

2.    Preconditions #2 and #3: Elizondo's analysis did not control for partisanship or disentangle race and politics...................................................................25

3.    The totality of the circumstances: The district court expressly found SBISD did not intentionally discriminate...............................................................29

B.    The Court should reverse and render. ......................................32

III.    Elizondo's suit fails because Section 2 furnishes no private right of action. .........................................................................................33

IV.    The Court should vacate the award of fees and costs because Elizondo is not a prevailing party. .......................................................35

CONCLUSION...............................................................................................36

CERTIFICATE OF COMPLIANCE.....................................................................37

CERTIFICATE OF SERVICE ............................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ala. State Conf. NAACP v. Alabama*,
   949 F.3d 647 (11th Cir. 2020), *cert. granted, judgment vacated, and*
   *remanded*, 141 S. Ct. 2618 (2021)......................................................................34

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)........................................................................................35

*Allen v. Milligan*,
   146 S. Ct. 1377 (2026).............................................................2, 20, 21, 23, 25

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*,
   86 F.4th 1204 (8th Cir. 2023) ......................................................................7, 34

*Bartlett v. Strickland*,
   556 U.S. 1 (2009)............................................................................................15

*Bone Shirt v. Hazeltine*,
   461 F.3d 1011 (8th Cir. 2006) ........................................................................24

*City of Hammond v. Lake Cnty. Bd. of Elections*,
   __ F.4th __, No. 24-1125, 2026 WL 1905077 (7th Cir. July 2, 2026)..............33

*Clark v. Calhoun County*,
   21 F.3d 92 (5th Cir. 1994) ..............................................................................16

*Cooper v. Harris*,
   581 U.S. 285 (2017).................................................................................15, 16

*Fusilier v. Landry*,
   963 F.3d 447 (5th Cir. 2020) ..........................................................................11

*Golan v. Saada*,
   596 U.S. 666 (2022)........................................................................................32

*Hebrew v. Tex. Dep't of Crim. Justice*,
   80 F.4th 717 (5th Cir. 2023) ...........................................................................33

*Jackson v. Tarrant County*,
     158 F.4th 571 (5th Cir. 2025) ...............................................................16

*Johnson v. De Grandy*,
     512 U.S. 997 (1994)...............................................................................13, 14

*Lackey v. Stinnie*,
     604 U.S. 192 (2025)................................................................................35

*Louisiana v. Callais*,
     146 S. Ct. 1131 (2026)............................................................*passim*

*LULAC v. Clements*,
     999 F.2d 831 (5th Cir. 1993) (en banc) .......................................11, 15

*Miss. State Conf. of Nat'l Ass'n for Advancement of Colored People v. State
     Bd. of Election Comm'rs*,
     739 F. Supp. 3d 383 (S.D. Miss. 2024), *judgment vacated and remanded*,
     __ S. Ct. __, No. 25-234, 2026 WL 1377105 (May 18, 2026).....................34, 35

*Nipper v. Smith*,
     39 F.3d 1494 (11th Cir. 1994) (en banc) ...........................................24

*Robinson v. Ardoin*,
     86 F.4th 574 (5th Cir. 2023) ....................................................33, 34

*Rose v. Raffensperger*,
     87 F.4th 469 (11th Cir. 2023) .................................................16, 24

*Sanchez v. Colorado*,
     97 F.3d 1303 (10th Cir. 1996) ...........................................................24

*Shaw v. Hunt*,
     517 U.S. 899 (1996)................................................................................18

*Shelby County v. Holder*,
     570 U.S. 529 (2013).................................................................................18

*Texas v. United States*,
     126 F.4th 392 (5th Cir. 2025) ..........................................................11

*Thornburg v. Gingles*,
     478 U.S. 30 (1986)..................................................................*passim*

*Turtle Mountain Band of Chippewa Indians v. Howe*,
   137 F.4th 710 (8th Cir. 2025), *cert. granted, judgment vacated, and
   remanded*, __ S. Ct. __, No. 25-253, 2026 WL 1377069 (May 18, 2026).........34

*Utah v. Su*,
   109 F.4th 313 (5th Cir. 2024) ........................................................................32

**STATUTES**

52 U.S.C. § 10301(a) ..............................................................................5, 6, 13, 35

52 U.S.C. § 10303(f)(2) ......................................................................................13

52 U.S.C. § 10310(e) ....................................................................................10, 35

Tex. Educ. Code § 11.052........................................................................................3, 22

**OTHER AUTHORITIES**

Jim Henson & Joshua Blank, *Trends in Latino Attitudes in Texas
   Foreshadowed Trump's Gains in 2024*, UNIV. OF TEX. AT AUSTIN, TEX.
   POL. PROJECT (Jan. 13, 2025),
   https://texaspolitics.utexas.edu/blog/trends-latino-attitudes-texas-
   foreshadowed-trump%E2%80%99s-gains-2024................................................29

Pamela S. Karlan, *Bang, Bang, Bang*, Callais *Kills Off the Voting Rights Act*,
   JUST SECURITY (June 4, 2026),
   https://www.justsecurity.org/140980/callais-kills-voting-rights-act/.................23

Issa Kohler-Hausmann & Kevin Z. Yang, *How* Callais *Broke the Voting
   Rights Act and Weaponized the Equal Protection Clause: Part 1*,
   SCOTUSBLOG (May 26, 2026),
   https://www.scotusblog.com/2026/05/how-callais-broke-the-voting-
   rights-act-and-weaponized-the-equal-protection-clause-part-1/ ........................26

S. Rep. No. 417 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177...............................15

Nicholas O. Stephanopoulos, *Election Law for the New Electorate*, 17
   OXFORD J. OF LEGAL ANALYSIS 42 (2025) .......................................................29

Nicholas O. Stephanopoulos, *Some Thoughts About* Callais, Election Law
   Blog (Apr. 29, 2026), https://electionlawblog.org/?p=155758 .........................11

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on August 6, 2025, and SBISD timely noticed this appeal on August 25, 2025. The district court subsequently entered an order awarding plaintiff her attorneys' fees and costs as a prevailing party on October 27, 2025, and SBISD timely noticed a second appeal on October 31, 2025. This Court consolidated the appeals on December 5, 2025, and removed the case from abeyance on May 6, 2026.

## ISSUES PRESENTED

1. Whether, under *Callais*, the judgment must be reversed because the district court's findings foreclose a "strong inference that [SBISD] intentionally" maintains an at-large election system "to afford minority voters less opportunity because of their race."

2. Whether Section 2 of the Voting Rights Act furnishes a private right of action.

3. Whether the attorneys' fee award must be vacated because Elizondo is no longer a "prevailing party" under 52 U.S.C. § 10310(e).

**INTRODUCTION**

This appeal exemplifies the sweeping change wrought by the Supreme Court's decision in *Louisiana v. Callais*, 146 S. Ct. 1131 (2026). In this Voting Rights Act case, the district court found that Spring Branch Independent School District (SBISD) is a high-functioning, racially diverse district that has *never* discriminated against Hispanics, that serves *all* its students exceptionally well, and that elects its Board of Trustees through a longstanding, at-large system designed to make every trustee accountable to every voter. The court found no intentional discrimination of any kind—not in SBISD's classrooms, not in its elections, not anywhere. Yet it ordered SBISD to dismantle its electoral system and create seven single-member districts based on the race of its voters. The district court believed that outcome was required by the Supreme Court's effects-based test for establishing a violation of Section 2 of the Voting Rights Act. *See Thornburg v. Gingles*, 478 U.S. 30 (1986). But the district court stayed its final judgment pending the Supreme Court's decision in *Callais*, reasoning that *Callais* "may effectively invalidate § 2 claims like those brought by [Virginia Elizondo]."

*Callais* did exactly that. It worked a sea change in Section 2 jurisprudence. A plaintiff can no longer prevail by showing racial effects alone; she must prove a "strong inference" that the government *intentionally* structured its election system "to afford minority voters less opportunity because of their race." *Callais*, 146 S.

1

Ct. at 1157.  Plaintiffs can no longer rely on "the mere fact that voters of different races vote for different parties" to prove "racially polarized voting patterns." *Allen v. Milligan*, 146 S. Ct. 1377, 1381 (2026).  And courts must honor the government's legitimate districting objectives—like creating an at-large system that ensures District-wide accountability—for a plaintiff can prevail only if her proposed map furthers those goals "just as well." *Id.*

These legal developments doom Elizondo's case.  The district court's own findings refute *any* inference of intentional discrimination, let alone the *strong* one *Callais* demands.  Worse, Elizondo's expert drew an illustrative district for the express purpose of engineering a Hispanic-majority district—which *Callais* forbids—while impermissibly eliminating the very at-large system SBISD is entitled to keep.  Under *Callais*, such a map has "no value."  146 S. Ct. at 1159.  Moreover, her expert's analysis never controlled for partisan affiliation, something that *Callais* confirmed is mandatory.  That omission was crucial because the record shows that partisanship and ideology, not race, drive SBISD's elections.  Justice Kagan put it bluntly: *Callais* "demoli[shes]" precisely the kind of claim Elizondo brought.  146 S. Ct. at 1166.  This Court should reverse and render judgment for SBISD.

2

**STATEMENT OF THE CASE**

## I.    Spring Branch Independent School District

SBISD is a "high functioning" public school district founded in 1946 in the west Houston area.[1]    ROA.2762–66.    For decades, SBISD's population was overwhelmingly Anglo.[2]    But beginning in the 1990s, an influx of Hispanic immigrants changed its composition.  ROA.2762–66.  By 2020, Anglos were 41.7% and Hispanics were 40.7% of the District's total population.  ROA.2763–64.  The "citizen voting-age population" (or CVAP) was 59.7% Anglo and 24.8% Hispanic.[3] ROA.2765–66.

SBISD is governed by a seven-member Board of Trustees, which has always been elected at-large.  ROA.2769, ROA.4150.  Texas law expressly authorizes at-large voting systems for school districts, Tex. Educ. Code § 11.052, and the "vast majority of school districts in Texas" conduct their elections this way, ROA.2838. Because all voters vote on each trustee, each trustee is accountable to the entire

---

[1] For purposes of this consolidated appeal, cites to the "ROA" refer to the record on appeal filed in the second appeal involving the award of attorneys' fees and costs, No. 25-20508, because it contains all of the documents from the first appeal, No. 25-20365, plus those relating to the second appeal.

[2] Like the district court, SBISD uses the term Anglo "to refer to white, non-Hispanics (*i.e.*, English speakers as opposed to Spanish speakers)."  ROA.2754.

[3] CVAP drops for Hispanics because a majority "are either too young to vote or are non-citizens who cannot vote."  ROA.2766.

District. ROA.2769. At-large elections "prevent cronyism" that can occur when "elected officials seek benefits only for their [geographic] precinct, while ignoring the good of all constituents." ROA.2838–39.

SBISD's formally nonpartisan elections are held every May, and trustees serve staggered three-year terms. ROA.2769.

## II.     The Politicization of School Boards

The last decade has seen surging partisan interest in school-board elections nationwide. In 2021, the Texas Republican Party created "a Local Government Committee" that would "assist county parties in electing conservative candidates in often-overlooked school board and municipal elections." ROA.2797–98 (citation omitted). While elections from 2015–2019 featured endorsements by teachers' unions and less intense partisan involvement, *e.g.*, ROA.2786–87, ROA.2789–90, later elections were consumed by COVID mask mandates in 2021, ROA.2793, opposition to "critical race theory ('CRT') and pornographic materials in school libraries" in 2022, ROA.2801, and endorsements from local and statewide political groups, and politicians like then-Texas GOP Chairman Matt Rinaldi and Senator Ted Cruz, in 2023–2024, ROA.2807, ROA.4489. Activists created local political action committees ("PACs"), like the "Spring Branch Families" PAC, dedicated to promoting "conservative principals in the governance positions of our school[s]." ROA.4489. A successful 2022 candidate illustrated this trend: Hispanic

4

conservative John Perez boasted endorsements from conservative and partisan organizations such as "the 1776 Project, Freedom Foundation of Texas PAC, Harris County Republican Party, Hispanic Republicans of Texas, Katy Christian Magazine, and Spring Branch Families PAC." ROA.4488.

### III.   Elizondo's Candidacies and the Lawsuit

Plaintiff Virginia Elizondo is a Hispanic resident who twice ran for the Board. ROA.2760–61. She ran as the "progressive" candidate in each race. She was endorsed by the Democratic Party and by a Democrat congressional candidate, backed by the AFL-CIO and a teachers' union, and portrayed as the candidate who would bring union involvement into the District. ROA.2603–04, ROA.2794. She first ran in 2015, losing to Chris Vierra by an 83% to 17% margin. ROA.2786. In 2021, she lost to Chris Earnest, who defeated her 60% to 40%. ROA.2793. Earnest was endorsed by the Republican Party, aligned himself with conservative causes, opposed COVID mask mandates and union involvement in the schools, championed in-person education, and appeared on a conservative Houston radio program. ROA.2604–05. After losing that second race, Elizondo sued SBISD.

Elizondo asserted that SBISD's at-large method for electing trustees violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. ROA.59. Section 2 forbids "any State or political subdivision" from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial

or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Her complaint alleged that "Texas has a despicable and regrettable history of racism." ROA.55. She claimed that the "socioeconomic disparities which exist in Harris County and in SBISD impact the ability of the minority community to influence state officials, state elections, and state educational policy." ROA.58.

Elizondo sought to dismantle SBISD's "historical[]" use of an at-large election system and replace it with a fundamentally different, single-member-district structure. ROA.54. Her only cause of action alleged that the at-large process "result[ed] in the denial or abridgement of the right to vote . . . by having *the effect* of canceling out or minimizing the individual voting strength as minorities." ROA.59 (emphasis added). As a remedy, Elizondo proffered a seven-district illustrative map with the sole purpose of assigning enough Hispanic voting-age citizens to one district to comprise a 52.8% share of CVAP in that district. ROA.2776–78.

## IV.   The Trial and the Remedial Map

The lawsuit culminated in a five-day bench trial in September 2024.[4] Elizondo contended that SBISD's at-large system harmed Hispanics in violation of

---

[4] Trial was originally set for December 2023. ROA.2195. Just before the trial date, the Eighth Circuit decided *Arkansas State Conference NAACP v. Arkansas*

Section 2.  Under the Section 2 framework adopted in *Thornburg v. Gingles*, 478 U.S. 30 (1986), Elizondo argued that she satisfied the first *Gingles* precondition because it was possible to draw a "sufficiently large and geographically compact" single-member district with a majority of Hispanic voters.  *Id.* at 50 & n.16.  For the second and third *Gingles* preconditions, Elizondo argued that Hispanic voters are "politically cohesive" and that the Anglo majority "votes sufficiently as a bloc to enable it . . . to defeat the [Hispanics'] preferred candidate."  *Id.* at 51.

Elizondo also sought to show that SBISD intentionally discriminated against Hispanics under the *Gingles* totality-of-the-circumstances test.  *See id.* at 45–46.  Among other things, she alleged that SBISD discriminated in its placement of early-voting locations, ROA.1978, ROA.2365–66, ROA.2643, and in failing to facilitate student voter registration, ROA.2365, ROA.2645.

SBISD defended its interest in maintaining the longstanding, at-large election system authorized by state law, which provides the best way to increase accountability, fight corruption, and boost transparency.    ROA.2166–67,

---

*Board of Apportionment*, holding that private parties may not sue to enforce Section 2 of the Voting Rights Act.  86 F.4th 1204 (8th Cir. 2023).  In response, the district court held a hearing, ROA.2261, and ultimately canceled the trial setting pending disposition of an anticipated petition for writ of certiorari in the Eighth Circuit case, *see* ROA.2262.  The district court kept the case in abeyance for over eight months.  *See* ROA.2313.  When Elizondo informed the court that her primary expert had fallen ill, the district court set the trial for September 2024.  ROA.2332.

ROA.2665–67, ROA.2713.   On the *Gingles* preconditions, SBISD introduced evidence showing that Elizondo's claimed *racial* polarization was really *partisan* polarization that Elizondo's analysis did not account for.   ROA.2617–18, ROA.2621, ROA.2820.   And SBISD contended that Elizondo's illustrative map impermissibly emphasized race in violation of the Fourteenth Amendment. ROA.1938–39, ROA.2179–80.   Finally, SBISD forcefully rebutted the allegations of intentional discrimination.   ROA.2167, ROA.2657.

The district court sided with Elizondo.   In its opinion, however, the court repeatedly found "no evidence of discrimination against Hispanics by the SBISD." ROA.2825; *see* ROA.2828, ROA.2831.   And it found "no evidence that the trustees or administrators of the SBISD failed to provide outstanding educational opportunities for all of SBISD's students or that they failed to act in the best interests of its Hispanic students."   ROA.2862.   The court nevertheless concluded that SBISD's at-large system unlawfully diluted Hispanic votes.   ROA.2862–63. Applying the *Gingles* preconditions, the court found that Elizondo's proposed illustrative district was compact and had a majority-Hispanic citizen voting-age population, and that racially polarized voting existed in most years.   ROA.2776–2817.  Notably, the court found *no* racial polarization in 2024—the most recent year on record.  ROA.2812.

The court rejected SBISD's showing that polarized voting was due to partisan politics rather than race. The court reasoned that SBISD ballots do not contain party labels, and it declared that "taxes, teacher unions, COVID regulations, 'parental choice,' 'woke' ideology in the classroom, 'critical race theory,' and sexually explicit books in school libraries," are "not strictly partisan political issues." ROA.2822.

On remedy, the court adopted Elizondo's plan for seven single-member districts that aimed to create a Hispanic-majority district. ROA.2965–67. The court ordered SBISD to run its May 2026 election with those single-member districts. ROA.2967.

## V.     The Stay and *Callais*

With the annual school-board elections fast approaching, SBISD planned to seek a stay of the district court's judgment pending appeal. Around the same time, the U.S. Supreme Court set *Callais* for re-argument in October 2025. *See* Order, *Louisiana v. Callais*, Nos. 24-109, 24-110 (U.S. Aug. 12, 2025). *Callais* initially involved whether Section 2 of the Voting Rights Act required Louisiana to create a second majority-minority district in its congressional map. On August 1, shortly before the district court issued its final judgment, the Supreme Court ordered the parties to file supplemental briefs addressing "[w]hether the State's intentional creation of a second majority-minority congressional district violates the Fourteenth

or Fifteenth Amendments to the U. S. Constitution." Order, *Louisiana v. Callais*, Nos. 24-109, 24-110 (U.S. Aug. 1, 2025).

In light of this development, SBISD moved for a stay pending appeal in the district court. ROA.3188–3203. The district court granted it: "Because the Supreme Court's impending decision in the *Callais* cases may effectively invalidate § 2 claims like those brought by Plaintiff," the court stayed its final judgment "pending appeal" to this Court. ROA.3322, ROA.3325.[5]

In *Callais*, the Supreme Court did precisely what the district court forecasted. *Louisiana v. Callais*, 146 S. Ct. 1131, 1157 (2026); *see infra* at 17–20. *Callais* fundamentally reshaped the Supreme Court's interpretation of Section 2. No longer can a plaintiff establish a Section 2 violation based purely on effects; she must now show that the evidence supports a "strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race." 146 S. Ct. at 1157. To implement its intent-based test, the Court added new requirements to the *Gingles* preconditions and strengthened the totality-of-the-circumstances test.

---

[5] The district court proceeded to resolve Elizondo's ancillary claim for attorneys' fees and costs as a "prevailing party" under the Voting Rights Act. *See* 52 U.S.C. § 10310(e). The court concluded that Elizondo was a prevailing party entitled to $1,252,944.80 in attorneys' fees and $184,358.14 in costs. ROA.3500. SBISD separately appealed that order because Elizondo's prevailing-party status depends on her success in the merits appeal.

*Id.* at 1159–60.  As a result of these changes, Justice Kagan's dissent forthrightly recognized that *Callais* "demoli[shes]" the type of effects-based Section 2 claim that Elizondo brought against SBISD.  *See id.* at 1166.  A leading scholar agreed that *Callais* "effective[ly] end[s] . . . Section 2 racial vote dilution claims."[6]

Shortly after *Callais* was decided, this Court took the case out of abeyance and issued a briefing schedule.

## STANDARD OF REVIEW

Whether the district court applied the correct legal standard under Section 2 is a question of law reviewed *de novo*, and the ultimate determination whether an at-large system violates Section 2 is a mixed question likewise reviewed *de novo*; the court's subsidiary historical findings are reviewed for clear error.  *See Fusilier v. Landry*, 963 F.3d 447, 461 (5th Cir. 2020); *League of Latin Am. Citizens, Council No. 4434 (LULAC) v. Clements*, 999 F.2d 831, 842 (5th Cir. 1993) (en banc).  When an intervening decision of the Supreme Court "fundamentally changes the focus of the relevant analysis," this Court's "precedents relying on that analysis are implicitly overruled."  *Texas v. United States*, 126 F.4th 392, 406–07 (5th Cir. 2025).

---

[6] Nicholas O. Stephanopoulos, *Some Thoughts About* Callais, Election Law Blog (Apr. 29, 2026), https://electionlawblog.org/?p=155758.

## SUMMARY OF ARGUMENT

*Callais* remade Section 2 jurisprudence. A plaintiff can no longer prevail on a vote-dilution claim by proving effects alone. She must establish a "strong inference" that the government *intentionally* maintained its election system to afford minority voters less opportunity *because of* their race, ethnicity, or language-minority status.

Elizondo's claim fails at each step of the updated *Gingles–Callais* framework. Her illustrative map dismantles SBISD's longstanding at-large system, which the district court found serves legitimate purposes like preventing cronyism and ensuring District-wide accountability. Under *Callais*, an illustrative map must achieve the government's legitimate objectives just as well. Elizondo's map definitionally does not. Elizondo's map was also drawn with race in mind, a practice *Callais* forbids.

Elizondo's evidence of race-based bloc voting is equally deficient. Her expert never controlled for partisan affiliation—a mandatory analytical step *Callais* now demands. And the record shows that ideology, not race, drove SBISD's election outcomes, as illustrated most powerfully by the 2022 election of John Perez, a Hispanic conservative who overwhelmingly won Anglo support. By 2024, even the appearance of racial polarization had vanished: No candidate garnered a majority of the Hispanic vote that year.

12

On the totality of circumstances, the district court's own findings foreclose the showing of present-day discriminatory intent *Callais* requires. After a five-day bench trial, the court repeatedly found no evidence of intentional discrimination against Hispanics by SBISD. And the district court found that all of Elizondo's historical-discrimination evidence involved other government entities and events that occurred many years ago—precisely the kind of evidence *Callais* holds is entitled to much less weight.

The Supreme Court in *Callais* applied its new test to the record and resolved the merits, forgoing a wasteful remand where the Section 2 plaintiffs' claim failed as a matter of law. Elizondo's claim is categorically precluded for the same reasons as those in *Callais*. This Court should therefore follow *Callais*'s example and reverse and render judgment for SBISD.

## ARGUMENT

**I.   *Callais* worked a sea change in Voting Rights Act jurisprudence.**

Section 2 of the Voting Rights Act forbids "any State or political subdivision" from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race" or language-minority status. 52 U.S.C. §§ 10301(a), 10303(f)(2). The right protected by Section 2 is "equality of opportunity, not a guarantee of electoral success for minority-preferred candidates

of whatever race." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994). The Supreme Court nonetheless originally interpreted the word "results" to impose a pure disparate-impact test. *Gingles*, 478 U.S. at 35–36.

Confronting the constitutional tension between Section 2 and the Fourteenth and Fifteenth Amendments, the *Callais* Court reinterpreted Section 2 and fundamentally reshaped its jurisprudence. Under *Callais*, Elizondo was required to establish a "strong inference" that SBISD "intentionally" maintained its at-large system "to afford minority voters less opportunity" to elect their preferred candidates "because of their race." 146 S. Ct. at 1157. She did not and could never make such a showing. *Callais* forecloses Elizondo's Section 2 claim as a matter of law on multiple grounds.

### A.    *Gingles* **permitted a purely effects-based Section 2 claim.**

For four decades, *Gingles* supplied the framework for every Section 2 vote-dilution claim. *Gingles* required a plaintiff to establish three threshold preconditions: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group is "politically cohesive," and (3) the racial majority "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50–51. A plaintiff who cleared those preconditions needed only to show, under the totality of the circumstances, that "the political processes leading to nomination or

14

election . . . are not equally open to" minority voters. *Id.* at 43. The totality inquiry looked to numerous factors that bore little relationship to whether minority voters could exercise the franchise free from governmental discrimination. *See, e.g.*, *id.* at 44–45 (listing factors such as "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health"). If the plaintiff succeeded at this stage, the court would then require a new map to include one or more "majority-minority" districts based explicitly on race. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality op.).

*Gingles* demanded no proof of discriminatory intent and no showing that racially polarized voting was attributable to race rather than partisanship. Congress's 1982 amendments to Section 2 were understood to have severed liability from intent, "codify[ing] a results test" and "mak[ing] clear that proof of discriminatory intent [was] not required to establish a violation of Section 2." *LULAC*, 999 F.2d at 849 (quoting S. Rep. No. 417, at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 179).

This focus on effects had predictable consequences. A pure results test meant that a plaintiff need only show the math: that a sufficient number of minority voters lived in a reasonably compact, illustrative district; that the minority group's voters consistently voted for particular candidates; and that the majority group's voters consistently voted to defeat the minority group's chosen candidate. *See Cooper v.*

15

*Harris*, 581 U.S. 285, 302 (2017) (noting that once the preconditions are satisfied, courts will have "good reason to believe that § 2 requires drawing a majority-minority district"). And if the math added up, the totality-of-the-circumstances test was rarely a barrier. *See Clark v. Calhoun County*, 21 F.3d 92, 97 (5th Cir. 1994) ("[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances."). Once those boxes were checked, courts regularly redrew districting lines or broke up at-large systems to achieve the desired racial makeup. *See Rose v. Raffensperger*, 87 F.4th 469, 476–77 (11th Cir. 2023) (collecting examples).

This state of affairs generated constitutional friction because jurisdictions began preemptively sorting voters by race to avoid Section 2 liability. The legitimate districting interests of states and localities took a back seat to the need to craft race-based districts. The resulting "sorting of persons with an intent to divide by reason of race" collided with the Fourteenth Amendment's Equal Protection Clause. *Jackson v. Tarrant County*, 158 F.4th 571, 585 (5th Cir. 2025) (citation omitted). And this led to a new constitutional conundrum: Whether drawing a race-based map to comply with Section 2 could satisfy strict scrutiny under the Equal Protection Clause. *See Callais*, 146 S. Ct. at 1143, 1147–48.

16

   **B.**    ***Callais*** **overhauled** ***Gingles*** **to require a "strong inference" of intentional discrimination at every stage of the Section 2 analysis.**

*Callais* relieved this constitutional tension by revamping the interpretation of Section 2.  To keep Section 2 within constitutional bounds, the Court held that Section 2 "imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race."  *Callais*, 146 S. Ct. at 1157.  Rather than completely abandoning *Gingles*, the Court instead "update[d] the framework so it aligns with the statutory text."  *Id.*  The Court did so by strengthening each step of the *Gingles* test to require evidence of intentional racial discrimination, rather than mere effects that fall along racial lines.

   **Precondition #1.**  Recall that *Gingles*'s first precondition required only that the minority group be "sufficiently large and geographically compact to constitute a majority in a single-member district," proven by an illustrative map.  478 U.S. at 50. *Callais* imposes two new conditions on that map.  146 S. Ct. at 1159.  *First*, the plaintiff "cannot use race as a districting criterion," full stop.  *Id.*  Indeed, "an illustrative map in which race was used has no value in proving a § 2 plaintiff's case."  *Id.*  *Second*, the illustrative map "must meet all the State's legitimate districting objectives," and the plaintiff's map "must achieve these goals just as well" as the government's approach did.  *Id.*

**Preconditions #2 and #3.** *Gingles*'s second and third preconditions required a showing of minority political cohesion and evidence that white bloc voting usually defeats the minority-preferred candidate. 478 U.S. at 51. *Callais* now demands that the plaintiff "provide an analysis that controls for party affiliation" and "show[s] that voters engage in racial bloc voting that *cannot be explained by partisan affiliation*." 146 S. Ct. at 1159–60 (emphasis added).

**Totality of the circumstances.** *Gingles* directed an open-ended totality inquiry guided by the so-called Senate factors, with no temporal limit and heavy reliance on historical and socioeconomic evidence. 478 U.S. at 78–79. *Callais* refocuses that inquiry on "present-day intentional racial discrimination regarding voting." 146 S. Ct. at 1160. "Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing 'effects of societal discrimination,' are entitled to much less weight." *Id.* (quoting *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996)). "Far more germane are 'current data' and 'current political conditions' that shed light on current intentional discrimination." *Id.* (quoting *Shelby County v. Holder*, 570 U.S. 529, 552–53 (2013)).

**Application.** Rather than vacate and remand, the Court applied its new framework to Louisiana's congressional map and resolved the merits. The Section 2 plaintiffs contended that Louisiana's initial map violated Section 2 because it did not create a second majority-black district. *Id.* at 1161. Louisiana answered that this

18

initial map did not discriminate based on race but instead sought to protect the seats of important Republican incumbents. *Id.* The Court held that the original map did not violate the Voting Rights Act. *Id.*

*First*, the Section 2 plaintiffs flunked the first precondition "because they did not provide an illustrative map that met all the State's nonracial goals," such as the partisan interest in protecting incumbents from defeat. *Id.* at 1161. *Second*, the Section 2 plaintiffs failed to "meet their burden on the second and third *Gingles* preconditions" because to "show racially polarized voting," they merely "offered evidence that black and white voters consistently supported different candidates, but their analysis did not control for partisan preferences." *Id.* at 1161–62. *Finally*, even if the Section 2 plaintiffs "had met their burden on the *Gingles* preconditions, they still would have failed to show an objective likelihood of intentional discrimination based on the totality of the circumstances." *Id.* at 1162. "Much of the cited evidence—such as the low number of black Louisianans who have been elected to Congress in recent decades—failed to disentangle race from politics." *Id.* The Court also faulted the district court for "cast[ing] aside as 'irrelevant' the lack of evidence that black voters had faced intentional discrimination in recent years," noting that the district court's "analysis had its priorities backwards." *Id.* The Court thus concluded that Louisiana's original map complied with Section 2. As a result, the

19

second race-based map that Louisiana had enacted to remedy the purported Section 2 violation violated the Equal Protection Clause. *Id.*

### C. *Allen* cemented the *Callais* approach.

The Supreme Court again applied the *Callais* framework in *Allen v. Milligan*, 146 S. Ct. 1377 (2026). Alabama's congressional map contained one majority-black district. *Id.* at 1381. A three-judge district court held that the map violated Section 2 and, invoking its earlier findings, concluded that Alabama had intentionally discriminated in refusing to draw a second majority-black district. *Id.* The district court maintained its intentional-discrimination holding even after re-analyzing the case under *Callais. Id.*

On an application to stay the district court's injunction, the Supreme Court held that Alabama was likely to succeed on the merits because the district court's analysis "departed from *Callais*." *Id*. The failures were manifest. *First*, the district court disregarded the presumption of legislative good faith, treating the State's "legal disagreement with the court's earlier remedial order as proof of discriminatory animus." *Id. Second*, on the illustrative-map requirement (*i.e.*, the first precondition), the district court "found a violation even though the plaintiffs' alternative map would not perform just as well as to the State's constitutionally permissible criteria," including keeping the Gulf Coast community of interest intact and avoiding the pairing of incumbents. *Id. Third*, the court "failed to follow"

20

*Callais*'s command that "the mere fact that voters of different races vote for different parties is not relevant to proving racially polarized voting patterns." *Id.*

## II.    This Court should apply *Callais* and reverse and render judgment in SBISD's favor.

Under *Callais*, this case is straightforward.  The district court expressly found no intentional discrimination by SBISD, past or present.  Consequently, the record forecloses the "strong inference" of intentional discrimination that *Callais* requires. 146 S. Ct. at 1157.  Indeed, Elizondo's claim is barred as a matter of law at each step of the revised Section 2 inquiry, just like the plaintiffs' claims in *Callais* and *Allen.* This Court should therefore follow the *Callais* roadmap, apply the new test to the existing record, and render judgment for SBISD rather than remand for a wasteful do-over.

### A.    Elizondo's claim fails at every step of the *Callais* framework.

Flunking any part of the updated *Gingles* framework warrants reversal. *Callais*, 146 S. Ct. at 1163.  Elizondo cannot satisfy a single *Gingles* precondition or the totality-of-the-circumstances test.  That is so for many of the same reasons the Supreme Court rendered judgment in *Callais.*

### 1.    Precondition #1: Elizondo's map impermissibly eliminated the at-large system and drew districts based on race.

Begin with the illustrative map.  Right out of the gate, Elizondo's illustrative map suffers from a fatal flaw: It does not "meet all [of SBISD]'s legitimate districting objectives." *Id.* at 1159.  SBISD has chosen, since its creation, to use an

21

at-large system for electing its trustees. ROA.4150. Texas law expressly authorizes this approach for school districts. Tex. Educ. Code § 11.052. The district court found that SBISD's at-large system rests on legitimate, non-tenuous reasons, including preventing cronyism, ensuring District-wide accountability, and suppressing parochial spending. ROA.2838–39. As SBISD established at trial, at-large systems were originally a product of the progressive movement "to break the corruption and the cronyism of local government." ROA.4563. The goal was to create a system where every member of the Board is "responsible to the entire district." ROA.4563. It also encourages democratic accountability: "If you create single-member districts like [Elizondo urged], those voters in [the majority-minority district] will only get to vote for one candidate every third year." ROA.4516. In the at-large system, "you get to vote for every trustee every year," thus ensuring that voters are "able to have a say in the way that the district is run every year, not just every third year with one person only and one vote only." ROA.4516. The district court further found that "at-large systems suppress pork-barrel spending because officials are beholden to all voters, not just those from a small area." ROA.2839.

Elizondo's single-member-district illustrative map dismantles that system and disserves SBISD's legitimate goals in maintaining it. The district court expressly found that "[u]nder the present at-large system[,] SBISD trustees are accountable to the voters in every middle school precinct; a single-member district system would

22

change that, even though SBISD is not a large territorial area." ROA.2839. Elizondo's illustrative map thus definitionally does not attain SBISD's "legitimate districting objectives" "just as well" as the at-large map. *See Allen*, 146 S. Ct. at 1380–81 (staying a judgment where the "plaintiffs' alternative map would not perform just as well as to the State's constitutionally permissible criteria").[7]

*Callais* resolved the merits for Louisiana because the Section 2 plaintiffs' illustrative map did not achieve the State's legitimate interest in protecting Republican incumbents. 146 S. Ct. at 1161–62. The same result follows *a fortiori* here, where Elizondo's desire for a single-member-district system cannot, by definition, achieve the State's and SBISD's goals in maintaining at-large systems. If a State's raw partisan interest in protecting incumbents (*Callais*) or entrenching a political party (*Allen*) counts as a legitimate objective that a plaintiff's illustrative map must satisfy, then SBISD's historical, nonpartisan, good-government interest in at-large elections surely qualifies. It would be passing strange if a jurisdiction with a longstanding, anticorruption-based at-large system were worse off under Section

---

[7] *See* Pamela S. Karlan, *Bang, Bang, Bang*, Callais *Kills Off the Voting Rights Act*, JUST SECURITY (June 4, 2026), https://www.justsecurity.org/140980/callais-kills-voting-rights-act/ ("[W]hen it comes to local offices, the Court's analysis [in *Callais*] creates a roadblock to challenging at-large elections, since by definition any section 2 suit seeks a change to the jurisdiction's current election criteria.").

2 than one that enacts a fresh partisan gerrymander. Elizondo's Section 2 claim thus founders at the starting line.[8]

Equally dispositive under *Callais*, Elizondo's illustrative map featured districts drawn based on race. "[I]n drawing illustrative maps, plaintiffs cannot use race as a districting criterion." *Callais*, 146 S. Ct. at 1159. Elizondo's expert, Dr. Stein, drew his illustrative "District 1" expressly "to create a district with a majority" Hispanic citizen voting-age population. ROA.2778–79. Stein testified that he "didn't really do very much" to create the illustrative map; all he did was "identif[y] at least one" district "where there was a sufficient—in this case, majority—of Hispanic voting age to create a district." ROA.1755. That is understandable, for in a pre-*Callais* world, a race-based map was a permissible component of establishing a Section 2 violation. But after *Callais*, "an illustrative map in which race was used

---

[8] Even before *Callais*, several circuits rejected Section 2 claims where the illustrative map did not propose a remedy consistent with the existing election system. *See Rose*, 87 F.4th at 479–86 (rejecting Section 2 challenge to at-large election system because proposed illustrative map did not maintain at-large structure); *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir. 1994) (en banc) ("Nothing in the Voting Rights Act suggests an intent on the part of Congress to permit the federal judiciary to force on the states a new model of government."); *Sanchez v. Colorado*, 97 F.3d 1303, 1311 (10th Cir. 1996) ("A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system." (quoting *Nipper*, 39 F.3d at 1530–31)); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1025 (8th Cir. 2006) (Gruender, J., concurring in the judgment) (similar).

has no value in proving a § 2 plaintiff's case." 146 S. Ct. at 1159. That too is dispositive and warrants reversal and rendition.

### 2.    Preconditions #2 and #3: Elizondo's analysis did not control for partisanship or disentangle race and politics.

Elizondo's claim also fails the second and third preconditions as a matter of law. *Callais* requires proof of racial-bloc voting "that cannot be explained by partisan affiliation." 146 S. Ct. at 1159–60. To make that showing, the plaintiff must "provide an analysis that controls for party affiliation." *Id.* at 1159. Elizondo did not do so here; the district court found that Stein did not "analyze[] the role of partisan politics in SBISD elections." ROA.2820. That defect is outcome-determinative. A plaintiff who does not provide the required analysis cannot satisfy the preconditions. *See Allen*, 146 S. Ct. at 1381 (faulting the district court's failure to "follow" *Callais*'s requirement because "the mere fact that voters of different races vote for different parties is not relevant to proving racially polarized voting patterns"). *Callais* rejected the Section 2 claim on the merits because the "[plaintiffs'] analysis did not control for partisan preferences," and this Court should do the same. 146 S. Ct. at 1163.

The district court made a cursory finding that voting cohesion in SBISD "is best attributed to race, not to partisan politics." ROA.2826. That finding is faulty for multiple reasons.

25

*First*, it is the product of a burden-shifting rule that *Callais* abrogated. The district court reached its finding only by placing the burden on SBISD to prove a race-neutral explanation and then (erroneously) deeming SBISD's showing lacking. ROA.2629–30. *Callais* inverts that allocation: The plaintiff—not the defendant— must "provide an analysis that controls for party affiliation" and affirmatively "show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." 146 S. Ct. at 1159.[9]  Because Elizondo's expert never performed that analysis, the burden *Callais* assigns to Elizondo was never carried.

*Second*, even taken on its own terms, the district court's finding cannot satisfy *Callais*'s standard. The court perceived racial motivations over partisan ones because SBISD elections are formally nonpartisan and "taxes, teacher unions, COVID regulations, 'parental choice,' 'woke' ideology in the classroom, 'critical race theory,' and sexually explicit books in school libraries," are "not strictly partisan political issues." ROA.2822. Even accepting *arguendo* this formalistic division between partisanship and issue-based voting, the district court's explanation

---

[9] Issa Kohler-Hausmann & Kevin Z. Yang, *How* Callais *Broke the Voting Rights Act and Weaponized the Equal Protection Clause: Part 1*, SCOTUSBLOG (May 26, 2026), https://www.scotusblog.com/2026/05/how-callais-broke-the-voting-rights-act-and-weaponized-the-equal-protection-clause-part-1/ ("*Callais* now asks **what explains** racial bloc voting, demanding that plaintiffs show that racial bloc voting is 'explained' by race rather than party.").

just means that the voters voted cohesively because of *issues*, not because of *race.* The district court's only evidence of *race*-based voting is that "Hispanic and Anglo voters in SBISD consistently prefer different candidates," ROA.2802, a rationale that failed as a matter of law in *Callais*, 146 S. Ct. at 1162 (rejecting as insufficient the evidence that "black and white voters consistently supported different candidates").

In any event, the trial record confirms that SBISD elections *can* "be explained by partisan affiliation." *Callais*, 146 S. Ct. at 1159. Cycle after cycle of SBISD elections, the more conservative candidate won and the more liberal candidate lost. Republican-endorsed Chris Earnest prevailed in 2021, and candidates backed by Senator Ted Cruz captured the Position 1 and Position 2 seats in 2023. ROA.2821–22. Perhaps the most revealing contest involved Carter Breed, a self-identified Republican incumbent who lost his seat only after he accepted, and failed to disavow, an endorsement from the Democratic Party. ROA.2821. When a Republican can be defeated merely by being labeled as acceptable to Democrats, party affiliation is doing the work, not race.[10]

---

[10] Breed lost to Lisa Alpe, who "was allied with the most conservative candidates" and "received endorsement from the conservative Spring Branch Families PAC." ROA.2821. Yet the district court saw race rather than partisanship at work because Breed and Alpe nominally "belonged to the same political party." ROA.2821.

The partisan-driven dynamic is likewise illustrated vividly by the successful candidacy of John Perez in 2022. A Hispanic conservative endorsed by Republicans, Perez won 73% of the Anglo vote while losing the Hispanic vote, all while his Anglo opponent won 83% of the Hispanic vote. ROA.2801–02, ROA.2814. That is textbook proof that ideology, not ethnicity, determines outcomes in SBISD.[11]

By 2024, even the surface-level appearance of racial polarization had vanished. The district court found that "[t]he 2024 SBISD election showed an absence of cohesive voting, with no candidate receiving a significant enough share of the Hispanic vote to indicate a cohesive preference for any candidate by Hispanic voters." ROA.2812. This outcome tracked statewide partisan trends, where Hispanic voters divided nearly evenly in 2024 between Republican and Democratic

---

[11] Faced with a Hispanic candidate who prevailed on the strength of Anglo support, the district court reasoned that "[a]lthough Perez testified that he is of Hispanic heritage, his testimony concerning his education, his occupation, and his children's schools shows that he has more in common with SBISD's Anglo population than with the majority of SBISD's Hispanic population." ROA.2802. In fact, Perez testified that he is a first-generation American and son of a migrant farm worker. ROA.2802, ROA.2814, ROA.4471. After growing up near the Texas–Mexico border, Perez graduated from Rice University and became a successful chemical engineer in Houston. ROA.2801. Whatever the relevance of this evidence before *Callais*, it should be apparent that *Callais* eliminates any need to assess whether Hispanic candidates "ha[ve] more in common" with Anglos than other Hispanics.

28

candidates.[12]  If Hispanic voters are not cohesive, there is no minority-preferred candidate for Anglo bloc voting to defeat.  *Callais*, 146 S. Ct. at 1159–60.

Given this trial record, Elizondo could never show that racial voting patterns "cannot be explained by partisan affiliation."  *Id*. at 1159.  The second and third preconditions thus fail decisively.

### 3.    The totality of the circumstances: The district court expressly found SBISD did not intentionally discriminate.

At the final stage, Elizondo had to "show an objective likelihood of intentional discrimination based on the totality of circumstances."  *Id.* at 1162.  Time and again, the district court found no evidence of such intent, conclusively closing the door on her claim after *Callais*.

*Callais* makes clear that a plaintiff must satisfy the totality test *in addition to* the modified *Gingles* preconditions.  *See id.* ("Even if the [Section 2] plaintiffs had met their burden on the *Gingles* preconditions, they still would have failed . . . on the totality of the circumstances.").  The updated totality inquiry focuses on "present-

---

[12] *See* Jim Henson & Joshua Blank, *Trends in Latino Attitudes in Texas Foreshadowed Trump's Gains in 2024*, UNIV. OF TEX. AT AUSTIN, TEX. POL. PROJECT (Jan. 13, 2025), https://texaspolitics.utexas.edu/blog/trends-latino-attitudes-texas-foreshadowed-trump%E2%80%99s-gains-2024; *see also* Nicholas O. Stephanopoulos, *Election Law for the New Electorate*, 17 OXFORD J. OF LEGAL ANALYSIS 42, 43–44 (2025) (noting, even before *Callais*, that decreasing polarization between Hispanic and Anglo voters created "serious" "practical difficulties in constructing minority opportunity districts").

day intentional racial discrimination regarding voting," while "[d]iscrimination that occurred some time ago . . . [is] entitled to much less weight." *Id.* at 1160. The district court's findings defeat Elizondo's claim under this standard: "Plaintiff presented no evidence of recent discrimination in SBISD. All of Plaintiff's evidence of discrimination involves other government entities, and most of these events occurred many years ago, and are not probative of current conditions." ROA.2826.

Even looking at events from the distant past, "[t]here is no evidence that SBISD ever segregated schools or discriminated against students on the basis of race or ethnicity." ROA.2826. In fact, "[a]part from the current allegations concerning SBISD's at-large election system, there is no evidence that any history of official discrimination in Texas or in SBISD has touched the right of Hispanics in SBISD to register, to vote, or otherwise to participate in the democratic process." ROA.2826.

The district court did not stop there. It systematically rejected each of Elizondo's attempts to prove intentional racial discrimination. It found no discriminatory intent or effect from SBISD's alleged noncompliance with the Texas Education Code's voter-registration provisions. ROA.2828. It found "no evidence of discriminatory intent or effect from SBISD's placement of early voting locations" or their hours of operation. ROA.2829. And it found that SBISD "did not create, promote, or fail to address" disparities in Hispanic students' learning outcomes. ROA.2831. With *Callais*'s new requirement that plaintiffs prove "present-day

30

intentional racial discrimination regarding voting," 146 S. Ct. at 1160, the district court's findings foreclose Elizondo's claim as a matter of law.

Even under pre-*Callais* law, the district court found that Elizondo satisfied only three of the nine Senate factors. ROA.2859. And on those factors, the district court relied on evidence that *Callais* discounts as having minimal relevance. *Compare* ROA.2830–31 (concluding that Hispanics "bear the effects of discrimination in areas such as education, employment, and health" and are "more likely to be economically disadvantaged than their Anglo peers"), *and* ROA.2832–33 ("Minority-preferred candidates have never been successful in trustee elections in SBISD," except one instance in 2017 "when Hispanic and Anglo voters preferred the same candidate, Chris Gonzalez, an Anglo with a Hispanic surname"), *with Callais*, 146 S. Ct. at 1160 ("present-day disparities that are characterized as the ongoing 'effects of societal discrimination,' are entitled to much less weight" (citation omitted)), *and id.* at 1162 (rejecting as irrelevant "the low number of black Louisianans who have been elected to Congress in recent decades"). As in *Callais*, "none of the evidence [the district court] cited" in its totality analysis "showed even a plausible likelihood of intentional discrimination by" SBISD. 146 S. Ct. at 1162. Accordingly, as in *Callais*, the totality test provides an independent reason for reversing and rendering judgment against Elizondo. *See id.*

31

To sum up: A school district that has never discriminated against Hispanics and has been responsive to its Hispanic community plainly did not "intentionally" maintain its election system "to afford minority voters less opportunity because of their race." *Id.* at 1157.

### B.   The Court should reverse and render.

*Callais* forecloses Elizondo's claim many times over as a matter of law. This Court should follow the Supreme Court's example in *Callais* by applying the new legal framework to the existing record and rendering judgment in SBISD's favor.

Both the Supreme Court and this Court typically vacate and remand when the Supreme Court announces a new rule of law that potentially affects the outcome of an appeal. *See Golan v. Saada*, 596 U.S. 666, 683 (2022); *Utah v. Su*, 109 F.4th 313, 319–20 (5th Cir. 2024). That approach allows the lower court to apply the new rule to the record in the first instance.

The Supreme Court, however, took a different path in *Callais* and applied its updated Section 2 test itself. 146 S. Ct. at 1161 ("Under the updated *Gingles* framework, the facts of this suit easily require affirmance."). The Court concluded that the Section 2 plaintiffs' claim failed because it could not satisfy any of the revised *Gingles* preconditions or the modified totality-of-the-circumstances inquiry. *Id.* at 1161–62; *supra* at 21–32. The dissent—which deplored the Court's new test— did not dispute the Court's decision to apply its test in the first instance or the

32

outcome of that exercise. The reason was obvious: "The consequences of the new *Callais* requirements show up immediately, in the majority's disposition of this case," because the new test is "well-nigh impossible" to satisfy. 146 S. Ct. at 1165, 1182 (Kagan, J., dissenting).

The Supreme Court's roadmap dictates the same outcome here. Elizondo's claim is decisively foreclosed for precisely the same reasons as those discussed in *Callais*. *Supra* at 17–20. Just as the defenders of the race-based map in *Callais* did not get a second bite at the Section 2 apple on remand, Elizondo should not either. Any disposition short of outright reversal would generate futile proceedings on remand and waste taxpayer dollars. *See, e.g.*, *Hebrew v. Tex. Dep't of Crim. Justice*, 80 F.4th 717, 721–22 (5th Cir. 2023) (applying newly heightened Title VII standard announced by Supreme Court during pendency of appeal); *see City of Hammond v. Lake Cnty. Bd. of Elections*, __ F.4th __, No. 24-1125, 2026 WL 1905077, at \*6–7 (7th Cir. July 2, 2026) (applying *Callais* on appeal to reject pre-*Callais* Section 2 claims). The Court should reverse and render.

## III.    Elizondo's suit fails because Section 2 furnishes no private right of action.

One threshold issue remains. Elizondo's entire suit rests on the premise that a private plaintiff may sue to enforce Section 2 of the Voting Rights Act. SBISD recognizes that this Court in *Robinson v. Ardoin* held that the Act contains a private right of action. 86 F.4th 574, 588 (5th Cir. 2023).

33

SBISD raises the issue to preserve it for potential *en banc* and Supreme Court review. The Eighth Circuit has squarely held that private plaintiffs cannot enforce Section 2—directly or through 42 U.S.C. § 1983—deepening a circuit split. *Compare Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1209–10 (8th Cir. 2023) (holding that only the Attorney General may sue directly under Section 2), *and Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710, 713 (8th Cir. 2025) (holding that Section 2 does not unambiguously confer an individual right enforceable by private plaintiffs under § 1983), *cert. granted, judgment vacated, and remanded*, __ S. Ct. __, No. 25-253, 2026 WL 1377069 (May 18, 2026) (remanding for further consideration in light of *Callais*), *with Robinson*, 86 F.4th at 587–91 (holding that private plaintiffs have a right of action under Section 2), *and Ala. State Conf. NAACP v. Alabama*, 949 F.3d 647, 651–54 (11th Cir. 2020) (same), *cert. granted, judgment vacated, and remanded*, 141 S. Ct. 2618 (2021).[13] The question bears exceptional and recurring importance, and its resolution could dispose of this case.

---

[13] The Supreme Court sent mixed signals on the private-right-of-action question in the wake of *Callais*. It vacated the Eighth Circuit's *Turtle Mountain* decision and remanded for reconsideration in light of *Callais*. But it simultaneously vacated and remanded a decision by a three-judge court in Mississippi that applied *Robinson* and affirmed that a private right of action exists under Section 2. *See Miss. State Conf. of Nat'l Ass'n for Advancement of Colored People v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 409 (S.D. Miss. 2024), *judgment vacated and*

The argument is also meritorious. Under *Alexander v. Sandoval*, a private right of action exists only where Congress has unambiguously created both a private right and a private remedy, and courts may not infer one from a statute's focus on the persons regulated or from its general prohibitory terms. 532 U.S. 275, 286–87 (2001). Section 2 is framed as a limit on what a "State or political subdivision" may do, and it nowhere confers, in the rights-creating, individual-focused terms *Sandoval* demands, a private right to sue. 52 U.S.C. § 10301(a). That Congress elsewhere authorized enforcement by the Attorney General and provided fees to a prevailing "party" does not supply that missing language. SBISD preserves the position that, properly analyzed under *Sandoval*, Section 2 does not authorize private enforcement.

## IV. The Court should vacate the award of fees and costs because Elizondo is not a prevailing party.

The district court awarded Elizondo her attorneys' fees and costs as a prevailing party under 52 U.S.C. § 10310(e). ROA.3484–3501. This award is the object of the second appeal. After *Callais*, Elizondo can no longer be a prevailing party, so the Court should vacate the district court's award of fees and costs. *See Lackey v. Stinnie*, 604 U.S. 192, 202 (2025).

---

*remanded*, __ S. Ct. __, No. 25-234, 2026 WL 1377105 (May 18, 2026) (remanding for further consideration in light of *Callais*).

35

## CONCLUSION

The Court should reverse the district court's judgment and render judgment in SBISD's favor on Elizondo's Section 2 claim. The Court should also vacate the district court's award of attorneys' fees and costs because Elizondo is not a "prevailing party" under the Voting Rights Act.

Respectfully submitted,

/s/ *Aaron M. Streett*

Thomas R. Phillips
BAKER BOTTS L.L.P.
401 South 1st St., Ste. 1300
Austin, Texas 78704
(512) 322-2500
tom.phillips@bakerbotts.com

Charles J. Crawford
Lucas C. Henry
ABERNATHY, ROEDER, BOYD
& HULLETT, P.C.
1700 Redbud Blvd., Ste. 300
McKinney, Texas 75069
(214) 544-4000
ccrawford@abernathy-law.com
lhenry@abernathy-law.com

Aaron M. Streett
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
beau.carter@bakerbotts.com

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on July 15, 2026.

*/s/ Aaron M. Streett*
Aaron M. Streett

## CERTIFICATE OF COMPLIANCE

The undersigned counsel states that this brief complies with Fed. R. App. P. 32(a)(7) because it contains 8,336 words, excluding the items allowed to be excluded pursuant to Fed. R. App. P. 32(f), as counted by a word processing system and, therefore, is within the word limit. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated: July 15, 2026

*/s/ Aaron M. Streett*
Aaron M. Streett